UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

ROBERT WEEKS,
   Plaintiff,

  vs.                                                  No. 07-1355

SYLVIA MAHONE, et.al.,
   Defendants

## SUMMARY JUDGEMENT ORDER

This cause is before the court for consideration of the defendants' motion for summary judgement [d/e 37, 39].

### I. BACKGROUND

The pro se plaintiff filed this complaint pursuant to 42 U.S.C.§1983 against six defendants at the Pontiac Correctional Center. Specifically, the plaintiff alleges that Medical Director Sylvia Mahone, Warden Eddie Jones, Dr. Libing Zhang, Clinical Services Supervisor Ted Conkling, Illinois Department of Corrections Director Roger Walker and Correctional Officer John Doe violated his Eighth Amendment rights when they were deliberately indifferent to his serious medical conditions. The plaintiff claims in December of 2006, he was suffering from mental health problems and swallowed five plastic spoons and a metal rod. The plaintiff says he told the defendants, but they refused to take any action for over a month period.

The defendants filed motions for summary judgement in December of 2008 and the clerk of the court notified the plaintiff that the dispositive motions had been filed. [d/e 40, 41]. Nonetheless, the plaintiff has failed to file any response to the dispositive motions.

### II. FACTS

The following facts are taken from the defendants dispositive motions and the attached exhibits:

Defendant Sylvia Mahone is a doctor employed by Wexford Health Sources as the Medical Director at Pontiac Correctional Center. Dr. Liping Zhang is employed by Wexford as a physician at the Pontiac Correctional Center.

Dr. Zhang first saw the plaintiff on December 3, 2006 during an urgent care visit. The plaintiff reported that he had swallowed a metal object two days ago and was in the ninth day of a hunger strike. The doctor says he examined the plaintiff, specifically his abdomen. The

1

plaintiff did not appear to be in any distress.  The doctor says the abdomen was benign and soft.  The doctor ordered a complete blood count and kidney, bladder and ureter X-rays.  Dr. Zhang says he also stressed that the plaintiff needed to drink more fluids.  The doctor placed the plaintiff on the hunger strike protocol. (Def. Memo, Zhang Aff, p. 2).

Dr. Zhang saw the plaintiff again the next day, on December 4, 2006.  The doctor's examination of the plaintiff showed no changes in his condition.   The doctor requested an X-ray to determine if he had swallowed a metal object.  The doctor again told the plaintiff to drink plenty of liquids and eat.  The plaintiff remained on a hunger strike. (Def. Memo, Zhang Aff, p. 2)

On the following day, December 5, 2006, Dr. Mahone met with the plaintiff for the first time.   The plaintiff had been referred by Dr. Zhang.   Dr. Mahone reviewed the X-rays which showed the plaintiff had ingested a 6 ½ inch metal object.  (Def. Memo, Dr. Mahone Aff. p. 2).  Dr. Mahone examined the plaintiffs abdomen and found it to be "lean, soft and non-tender with no distension." (Def. Memo, Dr. Mahone Aff, p. 2).  Dr. Mahone says his plan was to keep the plaintiff in the infirmary, offer him water and "Go Lytely." (Def. Memo, Dr. Mahone Aff, p. 2).  Dr. Mahone says Go Lytely is a pharmaceutical solution that induce diarrhea while rapidly cleansing the bowel, usually within four hours.  Dr. Mahone says he prescribed the medicine "in order to help him pass the foreign object he had swallowed." (Def. Memo, Dr. Mahone Aff., p. 2).

Dr. Zhang also saw the plaintiff on December 5, 2006, when he handled the plaintiff's admission to the infirmary.   The plaintiff had been on his hunger strike for 11 days.  Dr. Zhang also examined the plaintiff and noted that it was a "non-acute admission type, meaning the plaintiff was not in any distress and his problems were non-emergent." (Def. Memo, Dr. Zhang Aff, p. 3).  The doctor ordered the plaintiff to remain on his mental health medications as well as the Go Lytely. (Def. Memo, Dr. Zhang Aff, p. 3).

On December 6, 2006, the plaintiff was seen by both a nurse and Dr. Zhang.   When the nurse brought the Go Lytley prescription to the plaintiff, he refused to take it. (Def. Memo, Dr. Mahone Aff, p. 2-3).  The plaintiff told Dr. Zhang that he would not take the Go Lytely.   The plaintiff did ask for Tylenol for abdominal pain which was provided to him. (Def. Memo, Dr. Zhang Aff, p. 4).  Dr. Zhang noted that the plaintiff did not appear to be in distress and he was able to stand at his cell door without any difficulty.  Dr. Zhang noted that in her opinion, the plaintiff was "exhibiting manipulative behavior in that he was on a hunger strike and ingesting metal objects in order to obtain some sort of secondary gain." (Def. Memo, Dr.  Zhang Aff, p. 4)  Dr. Zhang ordered that the plaintiff's vital signs be taken once a day and that he be observed for any signs of distress.

Nurses checked on the plaintiff at 2:30 p.m., 5:00 p.m. and 11:00 p.m. that day.  Each noted that the plaintiff was not showing any signs of distress.  He remained on his hunger strike, but he was drinking water and he did take his mental health prescription. (Def. Memo, Dr.

2

Mahone Aff, p. 3-4).

On December 7, 2006, a nurse noted in the morning that the plaintiff was complaining of pain in his right abdomen. However, the plaintiff refused to provide a urine sample and also refused to take Go Lytely. The plaintiff's vital signs were checked and he was given water as he requested. (Def. Memo, Dr. Mahone Aff, p. 4).

A short time later, Dr. Zhang met with the plaintiff. The doctor noted that the plaintiff complained of abdominal pain, but was not in acute distress. His vital signs were normal. The plaintiff again refused the Go Lytely saying he did not want to have a bowel movement. (Def. Memo, Dr. Zhang Aff, p. 4). The plaintiff also refused to provide a urine sample so the medical staff could check for "ketones, which is something we do for inmates on hunger strikes." (Def. Memo, Dr. Zhang Aff, p. 4) Dr. Zhang says the plan was to follow up with another kidney, ureter, and bladder X-ray on the next day and continue with the hunger strike protocol.

The plaintiff was also seen by mental health staff on December 7, 2006. The plaintiff complained that mental health staff had mislead him about a possible transfer to Pontiac Mental Health Unit. The plaintiff wanted the transfer, but he was advised that a transfer was not possible while he was still on a hunger strike. The plaintiff attempted to elicit a promise of a transfer in return for ending his hunger strike. (Def. Memo, Mahone Aff, p. 4). Mental health staff noted that the plaintiff did not appear to be distress. He was coherent and showed no signs of "altered thinking/perception, no suicidal or homicidal ideation." (Def. Memo, Mahone Aff, p. 4) .

The plaintiff was seen by medical staff again at 12:55 p.m and 1:15 p.m. on December 7, 2006. Dr. Mahone decided that since the plaintiff was on his 14th day of a hunger strike, forced feeding would be ordered. Dr. Mahone again encouraged the plaintiff to end his hunger strike with no success. The plaintiff was very hostile, but the doctor says a tube was inserted into the plaintiff's stomach for feeding without difficulty. (Def. Memo, Mahone Aff., p. 5)

The plaintiff was seen by nursing staff again at 1:40 p.m., 3:00 p.m. and 9:30 p.m. The plaintiff was not showing any signs of distress and voiced no complaints until that evening. The plaintiff asked for Tylenol for abdominal pain and the nurse provided it to the plaintiff (Def. Memo, Mahone Aff, p. 6)

On December 8, 2006, the medical records show the plaintiff was again seen and examined repeatedly by nursing staff. He complained one time of severe abdominal pain and was given Tylenol. When the plaintiff was seen the next time, he did not complain of pain. A urine sample was obtained, but the plaintiff continued to refuse to eat. (Def. Memo, Dr. Mahone Aff, p. 7)

Dr. Mahone saw the plaintiff midday on December 8, 2006 and examined the plaintiff. The doctor noted that the plaintiff continued to refuse to eat and refuse to take Go Lytely. The

plaintiff did continue to take his mental health medications. The doctor noted this was the 15th day of the plaintiff's hunger strike and force feeding might be necessary to consider again the following day. (Def. Memo, Dr. Mahone Aff, p. 8).

The plaintiff was seen three more times by nurses on December 8, 2006 and showed no signs of distress. (Def. Memo, Dr. Mahone Aff, p. 8-9). On December 9, 2006, the plaintiff was seen by a doctor and a nurse. The plaintiff did not report any pain and the nurse reminded him that it was important to eat. The plaintiff ate all of his lunch and dinner on this day and had no reports of nausea or pain. (Def. Memo, Dr. Mahone Aff, p. 9).

On December 10, 2006, the plaintiff was again regularly checked by medical staff. The plaintiff continued to eat his meals and did not complain of pain. The plaintiff remained in the infirmary through December 11, 2006, eating all meals and making no reports of any pain. The plaintiff also continued to receive mental health medication and treatment from mental health staff. (Def. Memo, Dr. Mahone Aff, p. 12)

Dr. Mahone says she next saw the plaintiff on January 5, 2007 during an urgent care visit. The plaintiff said he had some abdominal pain after swallowing a foreign object on December 1, 2006. The doctor noted that although the plaintiff had refused treatment in the past, he now wanted treatment. The plaintiff also admitted that he has also swallowed five plastic spoons.

The doctor examined the plaintiff and found there was no bowel obstruction. The metal object appeared to be in the same area. Dr. Mahone prescribed medication and referred the plaintiff to the University of Illinois at Chicago (UIC) gastrointestinal unit for further evaluation. (Def. Memo, Dr. Mahone Aff, p. 13).

On January 10, 2007, UIC doctors said they wanted to first try an "endoscopic removal," so an appointment was arranged for January 26, 2007. Dr. Mahone says the endoscopy was performed on February 16, 2007.

> at which time it was determined that the Plaintiff had swallowed several Runsable spoons (sporks) and one eyeglasses side piece, all of which were found in his stomach. It was also determined that the spoons were tied together with a fabric cord (probably in a series) so removal was possible. (Def. Memo, Dr. Mahone Aff, p. 13-14)

The plaintiff was scheduled for surgery to have the items removed on February 19, 2007. Dr. Mahone says the objects were removed without complication.

Dr. Mahone and Dr. Zhang say they did not delay providing treatment to the plaintiff and they do not believe the plaintiff's condition was an emergency that required emergency medical treatment. Dr. Mahone and Dr. Zhang say the plaintiff was not in any acute distress at any time

after he reported that he had ingested the foreign objects. The doctors say the UIC gastroenterologist also did not believe an immediate appointment was necessary. The endoscopy and surgery were not completed until February 19, 2007. (Def. Memo, Dr. Mahone Aff, p. 14) (Def. Memo, Dr. Zhang Aff, p. 5-6).

The plaintiff in his deposition says this was the first time he ever swallowed a foreign object. The plaintiff says he tied the spoons together to keep them from coming out of his body. (Def. Memo, Plain. Depo, p. 17, 20). The plaintiff says he swallowed the material because "voices" told him to do it. (Def. Memo, Plain. Depo, p. 17).

The defendants have also provided copies of two letters the plaintiff wrote at the time he swallowed the items. In the letters, the plaintiff stated that he was going to do something to make correctional officials take him to the hospital. The plaintiff told the recipient to get a "crew" together to help him escape. (Def. Memo, Ex. C). The plaintiff provided details about how many officers would transport him to the hospital and what weapons they would have. (Def. Memo, Ex. C). The plaintiff was disciplined as a result of the letters.

Defendant Ted Conkling says he is the Clinical Services Supervisor at Pontiac Correctional Center. During the time frame of the plaintiff's complaint, Conkling says he was temporarily assigned to the job of Health Care Unite Administrator. (Def. Memo, Conk. Aff., p. 1). Conkling says his job was purely administrative and he has no formal medical training. Any inmate correspondence addressed to the Health Care Administrator was generally handled by clerical staff, and not by Conkling. (Def. Memo, Conk. Aff., p. 1-2). Conkling says staff would refer medical complaints to the medical staff or put the inmate in for sick call. (Def. Memo, Conk. Aff., p. 2).

Conkling says he has no memory of receiving any correspondence from the plaintiff regarding the issues in his complaint and had no personal involvement in the "diagnosis, treatment or medical care of the plaintiff." (Def. Memo, Conk. Aff., p. 2)

Defendant Eddie Jones says he is currently the Deputy Director of the Illinois Department of Corrections (IDOC). (Def. Memo, Jones Aff., p. 1) The plaintiff says in December of 2006, he was the Warden at Pontiac Correctional Center and was responsible for the overall operations of the institution. Jones says consequently he delegated the responsibility for dealing with most inmate grievances. (Def. Memo, Jones Aff., p. 1-2) If a grievance was submitted as an "emergency" grievance, a member of Jones' staff would investigate and report their findings to the Warden. Jones says he would then check the appropriate box on the grievance form based on that report. (Def. Memo, Jones Aff., p. 2)

Jones says correctional center records indicate that the plaintiff submitted a grievance complaining about medical care in January of 2007. Jones says he has no recollection of the grievance, but based on his procedure believes a member of his staff contacted the medical department. Furthermore, Jones says one of his designees signed his name to the grievance.

5

(Def. Memo, Jones Aff., p. 3) Jones says he relied on his medical staff to diagnose and treat the medical problems of inmates.

Teri Anderson says at the time frame of the plaintiff's complaint she was the Chairperson of the Administrative Review Board and assisted the Director by reviewing inmate grievance appeals. (Def. Memo, Anderson Aff. p. 1)  Anderson says IDOC Director Walker did not review or respond to the plaintiff's grievances.

### III. LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56c.  Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).  The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000).  A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e).  In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added).  Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).  "But the inferences and opinions must be grounded in observation or other first-hand personal experience.  They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

### IV.  ANALYSIS

The defendants argue that the plaintiff has failed to demonstrate that they were deliberately indifferent to his serious medical condition.  The plaintiff must pass both an

objective and a subjective test in order to establish that the defendants violated the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). The first prong of the test requires the plaintiff to demonstrate that the alleged deprivation was sufficiently serious. *Id*.

The second prong of the Eighth Amendment test requires the plaintiff to show that the defendants acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42) Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v Jones*, 823 F.3d 1068, 1072 (7th Cir. 1987). In addition, inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. *Forbes v. Edgar,* 112 F.3d, 262, 267 (7th Cir. 1997). Deliberate indifference is "something approaching a total unconcern for [the plaintiffs'] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v Lane,* 959 F.2d 673, 677 (7th Cir. 1992).

"[P]roof of deliberate indifference may be found where a prison official intentionally denies or delays access to medical care or intentionally interferes with the treatment once prescribed." *Jones v. Natesha* ,151 F.Supp.2d 938, 945 (N.D. Ill. 2001) *citing Ford,* 2001 WL 456427 at 6. However, "an inmate who complains that delay in medical treatment rose to constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996). Delays that cause "needless hours of suffering" can constitute harm. *Gil v. Reed,* 381 F. 3d 649, 662 (7th Cir. 2004).

The doctors in this case have demonstrated that they provided on-going care and constant monitoring of the plaintiff's condition. The doctors ordered X-rays, tests and eventually referred the plaintiff to outside medical specialists. There is no evidence the plaintiff suffered in severe pain during this time. There is no evidence that any medical provider considered his condition to be an emergency or thought the plaintiff was in substantial risk of serious harm. The court also notes the plaintiff failed to inform the medical staff of how many objects he had ingested and he refused to cooperate with treatment. The plaintiff has not responded to the summary judgement motion and there is no evidence that the defendants were deliberately indifferent to the plaintiff' medical condition.

The court also notes that some of the named defendants such as Conkling, Jones and Walker appear to have no personal involvement in the plaintiff's Eighth Amendment claim. A defendant cannot be held liable under 42 USC §1983 unless the plaintiff can demonstrate that the defendant's caused or participated in the alleged constitutional violation. *McBride v. Soos*, 679 F.2d 1223, 1227 (7th Cir. 1982). Also, the mere fact that an individual was a supervisor is insufficient to establish liability because the doctrine of *respondeat superior* (supervisor

liability) does not apply to actions filed under 42 USC §1983. *Pacelli v. DeVito*, 972 F.2d 871, 877 (7th Cir. 1992). A supervisor cannot be held liable for the errors of his subordinates.

In addition, administrators usually have no medical expertise and therefore must rely on health care professionals to assess the needs of prisoners and initiate treatment. *McEachern v. Civiletti,* 502 F.Supp. 532, 534 (N.D.Ill.1980). The defendants motions for summary judgement are granted. The motions for summary judgement are granted.

**ITS IS THEREFORE ORDERED that:**

> **1) The defendants' motions for summary judgement are granted pursuant to Fed. R. Civ. P. 56. [d/e 37, 39] The clerk of the court is directed to enter judgment in favor of the defendant in accordance with this order. The parties are to bear their own costs. This case is terminated.**
>
> **2) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)c. If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).**
>
> **3) The agency having custody of the plaintiff is directed to remit the docketing fee of $350.00 from the plaintiff's prison trust fund account if such funds are available. If the plaintiff does not have $350.00 in his trust fund account, the agency must send 20 percent of the current balance, or the average balance during the past six months, whichever amount is higher; thereafter, the agency shall begin forwarding monthly payments from the plaintiff's trust fund account to the clerk of court each time the plaintiff's account exceeds $10.00 until the statutory fee of $350.00 is paid in its entirety. The filing fee collected shall not exceed the statutory filing fee of $350.00.**
>
> **4) The plaintiff must notify the clerk of the court of a change of address and phone number within seven days of such a change. Release from incarceration does not relieve the plaintiff of his obligation to pay the filing fee in full.**
>
> **5) The clerk is directed to mail a copy of this order to the plaintiff's place of confinement, to the attention of the Trust Fund Office.**

Entered this 17th day of August, 2009.

**Harold a. Baker**
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE